THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **ADAM CUSTER** : | |
| 43 E Washington St : | |
| Jamestown, OH 45335 : | |
| : | |
| Plaintiff, : | CASE NO. 3:23-cv-15 |
| : | |
| v. : | JUDGE |
| : | |
| : | MAGISTRATE JUDGE |
| : | |
| **GOOGLE LLC** : | |
| 1600 Amphitheatre Parkway : | |
| Mountain View, CA 94043 : | |
| : | **Jury Demand Endorsed Herein** |
| Defendant. : | |
| : | |

## COMPLAINT

NOW COMES Plaintiff Adam Custer ("Plaintiff") and proffers this Complaint for damages against Defendant Google LLC ("Defendant").

## THE PARTIES

1. Plaintiff is a natural person residing in Greene County, Ohio.

2. Defendant is a foreign corporation doing business in the Southern District of Ohio.

3. At all relevant times, Plaintiff was an employee as that term is defined by the Americans with Disabilities Act of 1990 as amended, 42 U.S.C. §12101, et seq. ("ADA") and by O.R.C. Chapter 4112.

4. Defendant is an "employer" as defined by the Americans with Disabilities Act of 1990 as amended, 42 U.S.C. §12101, *et seq.* ("ADA") and by O.R.C. Chapter 4112.

## JURISDICTION AND VENUE

5. All counts contained herein are brought pursuant to the laws of the United States, therefore this Court has jurisdiction pursuant to 28 U.S.C. §1331.

6. This action is brought pursuant to the Americans with Disabilities Act of 1990 as amended, 42 U.S.C. §12101, *et seq*. ("ADA"), the Ohio Laws of Discrimination, R.C. Chapter 4112 ("Chapter 4112"), and 28 U.S.C. §1331. This Court's jurisdiction in this matter is also predicated upon 28 U.S.C. §1367 as this Complaint raises claims pursuant to the laws of Ohio, over which this Court maintains supplemental subject matter jurisdiction.

7. Venue is proper pursuant to 28 U.S.C. §1391, because Plaintiff entered into an employment relationship with Defendant in the Southern District of Ohio, Plaintiff performed his job duties there, and Defendant is doing and has done substantial business in the Southern District of Ohio.

8. Plaintiff has complied with all jurisdictional prerequisites to the filing of this lawsuit and this Complaint is filed within ninety (90) days of Plaintiff's receipt of her Right to Sue letter from the Equal Employment Opportunity Commission, a copy of which is attached hereto as "Exhibit A."

## FACTUAL BACKGROUND

9. Plaintiff was hired by Defendant on or around May 7, 2018, and immediately relocated from Ohio to Omaha to work at the Council Bluffs, Iowa Datacenter.

10. During Plaintiff's time in Iowa, Plaintiff worked as a Datacenter Technician II, where he had five managers, and received nothing but positive feedback, as reflected in his performance reviews.

11. In or around 2020, Plaintiff was promoted to a Datacenter Technician III.

12. Plaintiff was diagnosed with Specific Learning Disability ("SLD") and chronic medical conditions, including anxiety, in the years preceding and/or during his employment with Defendant Google.

13. Plaintiff suffered from frequent bouts of anxiety that left him temporarily unable to speak, type or spell and/or experienced symptoms related to these disabilities that required the use of accessibility software.

14. On or about February 4, 2020, Plaintiff relocated back home to New Albany, Ohio to work on the initial turnup of the new Ohio Google data center. Plaintiff was part of a small team that consisted of CCNR lead Achsah Joel Singari, B4 Network Lead Samantha Greer, and Plaintiff acting as the ACT turnup lead.

15. Initially, Plaintiff reported directly to the Site Manager, Rich McMunn. About a month later, Mamoudou Diallo was hired and became Plaintiff's manager.

16. In or around 2021, Mr. McMunn left the company and Mr. Diallo was promoted to Site Manager. The promotion occurred even after Plaintiff and others repeatedly raised concerns with Human Resources about Mr. Diallo's leadership.

17. The issues with Mr. Diallo began in or around 2020. Mr. Diallo implemented a morning meeting that would sometimes last for hours. During these daily meetings, Mr. Diallo became increasingly hostile, aggressive, and accusatory.

18. As a relatively new employee, Mr. Diallo did not understand what Plaintiff and his team were talking about, or Mr. Diallo would misinterpret things and raise his voice.

19. On or about July 31, 2020, Plaintiff approached Human Resources after Mr. Diallo disclosed another employee's personal medical information.

20. Plaintiff saw this as an opportunity to notify Defendant of Mr. Diallo's discriminatory conduct and remedy the pervasive harassment.

21. Defendant became aware of Mr. Diallo's behavior towards Plaintiff in or around the beginning of August 2020, when Plaintiff discussed his personal experience with Mr. Diallo's harassment in follow up calls with Human Resources.

22. Mr. Diallo was aware that for the duration of Plaintiff's tenure in Iowa, Plaintiff barely spoke, and his quiet disposition was a non-issue.

23. Plaintiff's reserved character was the main topic of many of the one-on-one meetings.

24. Mr. Diallo was aware that Plaintiff suffered from a disability, as he informed Mr. Diallo of his SLD diagnosis and anxiety diagnosis between the end of 2020 through April 2021 and that he received treatment for his disability in the past.

25. Plaintiff mentioned his disability more than once in an attempt to get Mr. Diallo to understand the reason behind his quiet disposition stop the harassment.

26. At one of the morning meetings, Mr. Diallo took particular interest in berating Plaintiff. Plaintiff attempted to explain the details so that Mr. Diallo understood, but each time Plaintiff tried to elaborate, Mr. Diallo interrupted Plaintiff and raised his voice.

27. Mr. Diallo's childish behavior continued until Plaintiff got so flustered that he was unable to speak. Plaintiff was left stammering and stumbling over his words, which

bizarrely put a big smile on Mr. Diallo's face, as if he was happy with how upset he was able to make Plaintiff.

28. Mr. Diallo then pulled Plaintiff into his office immediately following the meeting. Mr. Diallo sat Plaintiff down and rolled his chair directly next to Plaintiff's and leaned in so that he was inches from Plaintiff's face.

29. He started whisper yelling while wagging his finger against Plaintiff's chest. Mr. Diallo explained to Plaintiff that he looked like "a fucking fool, an idiot, a small child." Mr. Diallo continued that "everyone in the morning meeting thinks you are a fucking fool." Mr. Diallo ironically finished his rant by telling Plaintiff that he needs to act like a leader.

30. From the end of 2020 to in or around April 2021, it became a regular occurrence for Mr. Diallo to get in Plaintiff's face and speak to him in a condescending tone. This was during the height of the COVID-19 pandemic, yet Mr. Diallo adamantly refused to wear a mask as he yelled in Plaintiff's face.

31. Plaintiff was asthmatic and was especially concerned about COVID-19. Mr. Diallo was seemingly indifferent to his concerns. Mr. Diallo's rants intensified but remained along the same lines, frequently telling Plaintiff that other team members thought he was "a fucking fool."

32. Mr. Diallo told Plaintiff that he was too nice, and that "being a nice guy was a problem."

33. Mr. Diallo told Plaintiff to stop being soft-spoken and shy because that "is not how a leader should present himself."

5

34. Mr. Diallo also told Plaintiff that he was "fucking the company." Mr. Diallo then elevated his harassment against Plaintiff by reprimanding him for things that were misconceptions on his part. Mr. Diallo's treatment of Plaintiff was clearly targeted at Plaintiff's disability, as Plaintiff repeatedly told Mr. Diallo that he suffered from an anxiety disorder.

35. Despite this, Mr. Diallo continued to yell in Plaintiff's face. Each conversation between Plaintiff and Mr. Diallo ended with the same outcome; Mr. Diallo would have a misconception about Plaintiff's tasks, would assume it was wrong and directly linked Plaintiff's work performance back to his shy attitude, then inform Plaintiff that his attitude and work performance were unacceptable.

36. On a rare occasion, Mr. Diallo told Plaintiff that he could be a people manager or a project manager if he was able to be more vocal.

37. Plaintiff previously informed Mr. Diallo when they first met in or around March 2020, that as a skilled worker in a technical field, Plaintiff had no desire to go into project or general management and preferred to remain a technical point of contact for projects.

38. On multiple occasions in the beginning of 2021, Mr. Diallo requested Plaintiff type-up meeting minutes so others not in attendance could understand what was discussed. After one of the meetings, Mr. Diallo brought Plaintiff into his office and asked him to open his personal notes so he could review them.

39. Mr. Diallo immediately began telling Plaintiff what to type in his own notes.

40. Plaintiff briefly hesitated and told Mr. Diallo that he preferred if he did not watch him type, Mr. Diallo quickly snapped at Plaintiff and became incredibly vicious.

6

41. Plaintiff again attempted to explain that he suffered from SLD. Instead of showing understanding and remorse, Mr. Diallo began to laugh. Plaintiff stated that due to his SLD he used accessibility software, a screen reader and that he struggled at times to type, read, and spell.

42. Plaintiff explained that it would be humiliating for Mr. Diallo to sit over his shoulder and watch Plaintiff. Through his laughter, Mr. Diallo started calling Plaintiff "special," and that he never knew Plaintiff was "a special one." Shocked and humiliated, Plaintiff quickly left his office.

43. The following day, Plaintiff was forced to sit next to Mr. Diallo and type his notes. For the entirety of this interaction, Mr. Diallo told Plaintiff what to type. Mr. Diallo was quickly irritated at Plaintiff and snapped at him for mistyping and/or misspelling words.

44. There was no work objective for this task, Mr. Diallo simply harassed Plaintiff by yelling, laughing, and treating Plaintiff like he was an imbecile as a way to gauge how bad Plaintiff's SLD was and to humiliate him for suffering from his disability.

45. Plaintiff previously discussed Mr. Diallo's conduct with Human Resources on or about July 31, 2020, and subsequently went to HR in or around April 26, 2021, after a temporary employee raised unrelated issues with Mr. Diallo. Plaintiff saw this as another opportunity to inform Human Resources of Mr. Diallo's constant harassment.

46. Several weeks after Plaintiff's April 26, 2022, meeting with Human Resources and numerous interviews with Human Resources, Defendant informed Plaintiff that Mr. Diallo's behavior had been dealt with and the case was closed.

47. Between the end of 2021 to the spring of 2022, Mr. Diallo's behavior marginally improved in group settings. It was abundantly clear that Mr. Diallo put on a façade and masked his vicious behavior towards others with flattery and false kindness.

48. Despite this, Plaintiff remained acutely aware that Mr. Diallo was still the same person. Mr. Diallo continued to make Plaintiff's work life miserable in smaller group settings, Mr. Diallo regularly saw problems where there were none, and habitually became aggressive and accusatory in one-on-one conversations.

49. Mr. Diallo was acutely aware that Plaintiff spoke to HR because Mr. Diallo directly addressed the topic in one-on-one conversations following Plaintiff's April 26, 2021, meeting with Human Resources, and would silently stare Plaintiff down like he was about to lose his cool.

50. In or around May 2021, Plaintiff and Mr. Diallo conducted a routine meeting at the end of each performance review cycle. During this meeting, Mr. Diallo directly addressed Plaintiff's filed complaint with Human Resources.

51. Mr. Diallo explained that calling Plaintiff "Special" is not a bad thing and that "Special" is not derogatory. Mr. Diallo became visibly angry as he explained himself and tried to place the blame on Plaintiff.

52. Mr. Diallo asked Plaintiff why he would go to Human Resources and not simply talk to him.

53. Mr. Diallo stopped himself and began to stare at Plaintiff with an upset look.

54. Plaintiff did not know how to answer Mr. Diallo, who continued to stare at Plaintiff.

55. Mr. Diallo finished the meeting and told Plaintiff that he intended to put this behind them and move forward, that it was all in the past, and that they were starting over.

56. Mr. Diallo framed the remark in a way as if he gave Plaintiff a second chance to change Plaintiff's behavior.

57. No matter how much Plaintiff pleaded to be left alone and how incredibly uncomfortable it made him feel, Mr. Diallo repeatedly asked why he went to HR, and even attempted to convince Plaintiff that his anxiety issues were simply performance issues related to his job.

58. Plaintiff's most recent performance review occurred in or around July 2022. During the review, Mr. Diallo provided his typical lecture about Plaintiff's shyness, along with unsolicited advice on how and why Plaintiff needed to stop this behavior.

59. Mr. Diallo then brought up that Plaintiff's behavior will "fuck the company" because he was too nice. Mr. Diallo explained that because he was so nice, others perceive Plaintiff negatively, and even affected Plaintiff's personal life, resulting in Plaintiff "fucking himself."

60. Mr. Diallo then transitioned his performance review rant into Plaintiff's personal life. Mr. Diallo told Plaintiff he could see his problem outside of work, and implied that his anxiety is the reason Plaintiff was not in a relationship.

61. Mr. Diallo repeated this several times to Plaintiff and ensured he understood what he was implying. It was immediately clear to Plaintiff because Mr. Diallo was previously making an ongoing joke about Plaintiff's relationship status.

62. In or around the end of August or beginning of September 2022, Plaintiff, Mr. Diallo and Project Co-Lead David Hanson, gave a tour to a few unnamed upper managers.

63. During the tour, Mr. Diallo noticed that although Plaintiff was talking, he appeared anxious. Mr. Diallo pulled him aside and yelled at Plaintiff in the same manner as previous encounters. Mr. Diallo raised his finger and his voice, "You need to start participating…We have talked about this over and over."

64. Plaintiff could not explain how he felt in that moment other than like a child that got caught doing something bad. But instead of a child who was yelled at for acting up, Plaintiff, an adult, was berated for having a diagnosed disability while experiencing the symptoms of his disability.

65. Mr. Diallo accomplished nothing other than significantly worsening Plaintiff's anxiety. Plaintiff spoke with HR about Mr. Diallo's behavior on numerous occasions, yet the issue was never fully resolved. Instead, almost every one of the employees that started in early 2020 jumped to another team in order to avoid Mr. Diallo.

66. Plaintiff struggled to stop Mr. Diallo's pervasive harassment, and similar to other employees who transferred to another team, Plaintiff took all possible steps to avoid Mr. Diallo. Plaintiff became so stressed from this treatment that he started manifesting physical symptoms to the anxiety, specifically suffering from urinary incontinence issues, and was forced to call off sick.

67. On or about the morning of September 27, 2022, Plaintiff was at his wits end. He convinced himself that it was no longer worth going to work if it meant he had to suffer Mr. Diallo's unending harassment.

68. Plaintiff typed a resignation letter to his HR representative, Margaret Payano, then posted "I quit" in the team group chat. Manager Alexandr Adlovatski subsequently phoned Plaintiff in an attempt to talk him out of quitting.

69. Mr. Adlovatski told Plaintiff that he could switch managers so that Mr. Adlovatski became his manager, thus remedying the issues with Mr. Diallo. Based on Mr. Adlovatski's promise, Plaintiff decided to rescind his resignation and continued his employment with Defendant.

70. On or about October 25, 2022, Plaintiff had a call with Ms. Payano from HR. Ms. Payano informed Plaintiff that he was prohibited from switching managers and that he would not be able to avoid Mr. Diallo.

71. Ms. Payano told Plaintiff that they could give Mr. Diallo additional coaching. But to do this he would be notified that Plaintiff went to HR, giving Mr. Diallo ample opportunity to retaliate against him.

72. Plaintiff had exhausted every option to remedy the harassment. But nothing ever changed.

73. Plaintiff was psychologically harmed and manifested physical symptoms as a result of his work environment.

74. On or about December 2, 2022, after Defendant refused to take any action, Plaintiff was constructively discharged from his position. To end the harassment, he had no choice but to resign.

75. Plaintiff loved his job until Mr. Diallo created an unbearable environment filled with contempt, mockery, and clear instances of discriminatory conduct.

11

76. If Defendant had done its due diligence to address the conduct by Mr. Diallo, it could have protected Plaintiff from the discriminatory conduct he experienced during his employment with Defendant.

## COUNT I - ADA
### Disability Discrimination - Hostile Work Environment/Constructive Discharge

77. Plaintiff reasserts and reincorporates each and every allegation in the preceding paragraphs as if fully rewritten herein.

78. Defendant engaged in conduct that violates the Americans with Disabilities Act of 1990 as amended, 42 U.S.C. §12101, *et seq*. by harassing Plaintiff based on his disability, and by creating and encouraging a hostile work environment for Plaintiff based on his disability, by refusing to remedy the situation and provide a reasonable and non-hostile work environment, and by constructively discharging/terminating Plaintiff when it refused to act to protect him from Mr. Diallo.

79. The harassment of Plaintiff by Mr. Diallo was unwelcome, which was indicated by Plaintiff on a near-daily basis from the end of 2020 to October 2022.

80. The harassment was based on Plaintiff's disability, as Mr. Diallo was aware of Plaintiff's condition and intentionally called Plaintiff a "special one" and "a fucking fool", told Plaintiff to stop being soft-spoken and shy because that "is not how a leader should present himself," attempted to convince Plaintiff that his anxiety issues were simply performance issues related to his job, and berated Plaintiff for having a diagnosed disability while experiencing the symptoms of his disability.

81. Defendant knew or should have known of the harassment yet did not take immediate and corrective action.

12

82. Defendant unreasonably failed to take prompt and appropriate corrective action when they failed to ensure that disabled employees could work in an environment free from harassment.

83. As a result of the hostile work environment described herein, Plaintiff was constructively discharged from his employment.

84. The harassment unreasonably interfered with Plaintiff's work performance because his work environment became so hostile and offensive that he was forced to resign.

85. Defendant's actions made Plaintiff's working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign.

86. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including, but not limited to, serious emotional distress, loss of salary, benefits, and other terms, privileges, and conditions of employment for which Defendant is liable.

87. Defendant's conduct was willful, wanton, reckless, and/or malicious for which Defendant is liable for compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

### COUNT II - Ohio Civil Rights Act
### Disability Discrimination - Hostile Work Environment and Constructive Discharge

88. Plaintiff reasserts and reincorporates each and every allegation in the preceding paragraphs as if fully rewritten herein.

89. Defendant engaged in conduct that violates R.C. § 4112 prohibiting disability discrimination by harassing Plaintiff based on his disability, and by creating and encouraging a hostile work environment for Plaintiff based on his disability, by refusing to remedy the situation and provide a reasonable and non-hostile work environment, and by

constructively discharging/terminating Plaintiff when it refused to act to protect him from Mr. Diallo.

90. The harassment of Plaintiff was unwelcome, which was indicated by Plaintiff on a near-daily basis from the end of 2020 to October 2022.

91. The harassment was based on Plaintiff's disability, as Mr. Diallo was aware of Plaintiff's condition and intentionally called Plaintiff a "special one" and "a fucking fool", told Plaintiff to stop being soft-spoken and shy because that "is not how a leader should present himself," attempted to convince Plaintiff that his anxiety issues were simply performance issues related to his job, and berated Plaintiff for having a diagnosed disability while experiencing the symptoms of his disability.

92. Defendant knew or should have known of the harassment yet did not take immediate and corrective action.

93. Defendant unreasonably failed to take prompt and appropriate corrective action when they failed to ensure that disabled employees could work in an environment free from harassment.

94. As a result of the hostile work environment described herein, Plaintiff was constructively discharged from his employment. The harassment unreasonably interfered with Plaintiff's work performance because his work environment became so hostile and offensive that he was forced to resign.

95. Defendant's actions made Plaintiff's working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign.

96. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including, but

14

not limited to, serious emotional distress, loss of salary, benefits, and other terms, privileges and conditions of employment for which Defendant are liable.

97. Defendant's conduct was willful, wanton, reckless, and/or malicious for which Defendant is liable for compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

WHEREFORE, Plaintiff demands:

For all Counts, monetary damages including back pay and benefits, statutory liquidated damages, expert witness fees and attorneys' fees and costs, and front pay, compensatory damages and punitive damages in an amount to be determined at trial, but in any event not less than $75,000.00 and any and all other relief, which the Court deems just and appropriate.

Respectfully submitted,

/s/ *Rachel Sabo Friedmann*
Rachel Sabo Friedmann (0089226)
*Rachel@thefriedmannfirm.com*
Casey D. Mayell (0102178)
*Casey@thefriedmannfirm.com*
**The Friedmann Firm LLC**
**(614) 610-9757**
3740 Ridge Mill Dr.
Hilliard, Ohio 43026

*Attorneys for Plaintiff*

## **JURY DEMAND**

Plaintiff hereby requests a jury of at least eight (8) persons.

/s/ *Rachel Sabo Friedmann*
Rachel Sabo Friedmann (0089226)